[Civ. Nos. 52264, 52265. Second Dist., Div. Two. Apr. 18, 1978.]

SAN GABRIEL VALLEY WATER COMPANY,
Plaintiff and Appellant, v.
CITY OF MONTEBELLO et al., Defendants and Appellants.

**COUNSEL**

Beardsley, Hufstedler & Kemble, Burton J. Gindler and Evelyn Balderman for Plaintiff and Appellant.

Robert Flandrick, City Attorney, Burke, Williams & Sorensen and Dennis P. Burke for Defendants and Appellants.

**OPINION**

**ROTH, P. J.—**

### PRIOR PROCEEDINGS

Respondent and cross-appellant San Gabriel Valley Water Company (the Company) filed its action in Los Angeles Superior Court against appellants and cross-respondents City of Montebello and the Montebello Community Redevelopment Agency (jointly, the City) on May 15, 1974, seeking damages under Public Utilities Code sections 1503 and 1504 and for injunctive relief restraining the City from imposing certain conditions

of approval for construction of new subdivisions within its confines. The injunctive relief sought was denied after hearing prior to the trial. Trial (1) as to the applicability of the sections and (2) as to damages was bifurcated by stipulation. The Company was awarded a judgment of $350,000 as just compensation for damage suffered as a result of the "taking" by the City of the Company's property under sections 1503 and 1504 and the trial court having determined the action was one of inverse condemnation. The Company was also awarded its litigation expenses and attorney fees. The City appeals from the judgment against it; the Company cross-appeals claiming abuse of the trial court's discretion in its award of litigation expenses and City's fees.

## FACTUAL BACKGROUND

The Company initiated its water service as a privately owned utility in 1960 through acquisition of a mutual water company operating in certain areas of Montebello and thereafter until 1968 expanded the boundaries of its service area. By 1970 it had constructed facilities both within and without Montebello to meet requirements of customers within the service area. In 1967, the City purchased a small water system in the southern industrial portion of Montebello, outside the Company's service area and in 1972 acquired another privately owned utility whose system in part is adjacent to the Company's service area. Subsequent expansion and construction extended the City's service coverage within or adjacent to that served by the Company and the City instituted a policy whereby all new developments were required to take water service from the City as a condition of approval to coincident subdivision tract maps. The Company, maintaining it had been damaged by the City's actions, undertook the legal recourse described hereinabove.

## ISSUES ON APPEAL

I. Establishing Valuation and Damages Under Public Utilities Code Sections 1503 and 1504.

Public Utilities Code sections 1503 and 1504 are part of comprehensive legislation (denominated the Service Duplication Law) enacted in 1965 based upon legislative findings that:

The Legislature recognizes the substantial obligation undertaken by a privately owned public utility which is franchised under the Constitution or by a certificate of public convenience and necessity to provide water service in that the utility must provide facilities to meet the present and prospective needs of those in its service area who may request service. At the same time, the rates that may be charged for water service by a regulated utility are fixed by the Public Utilities Commission at levels which assume that the facilities so installed will remain used and useful in the operation of the utility for a period of time measured by the physical life of such facilities.

The Legislature finds and declares that the potential loss of value of such facilities which may result from the construction and operation by a political subdivision of similar or duplicating facilities in the service area of such a private utility often deters such private utility from obtaining a certificate or extending its facilities to provide in many areas a water supply essential to the health and safety of the citizens thereof.

The Legislature further finds and declares that it is necessary for the public health, safety, and welfare that privately owned public utilities regulated by the state be compensated for damages that they may suffer by reason of political subdivisions extending their facilities into the service areas of such privately owned public utilities.

Those sections provide respectively:

"§ 1503. ACT CONSTITUTING TAKING OF PRIVATE UTILITY'S PROPERTY FOR PUBLIC PURPOSE: CONSTITUTIONAL COMPENSATION

"The Legislature finds and declares that whenever a political subdivision constructs facilities to provide or extend water service, or provides or extends such service, to any service area of a private utility with the same type of service, such an act constitutes a taking of the property of the private utility for a public purpose to the extent that the private utility is injured by reason of any of its property employed in providing the water service being made inoperative, reduced in value or rendered useless to the private utility for the purpose of providing water service to the service area . . . ."

"§ 1504. Just Compensation: Fixing by Agreement or by Eminent Domain Proceedings: Political Subdivision's Authority to Acquire Property, and Payment of Compensation

"Just compensation for the property so taken for public purposes shall be as may be mutually agreed by the political subdivision and the private utility or as ascertained and fixed by a court of competent jurisdiction pursuant to the laws of this state relating to eminent domain, including consideration of the useful value to the political subdivision of the property so taken.

"Whenever the compensation by a political subdivision under this section is an amount equal to the just compensation value of all the property of the private utility in the operating system that the private utility employs in providing water service to the service area, the political subdivision may, by resolution, provide for the acquisition of all such property.

"A political subdivision engaged in activities set forth in Section 1503 shall pay just compensation for the property so taken for public purposes."

The City challenges the award granted the Company, contending it was based on a method of valuation which should have been accorded little weight by the jury under instruction to that effect which the trial court declined to give. The Company's expert testified that in his opinion, damage resulting from the City's taking under the facts of the case could only be appropriately established through a method described as "reconstruction cost new less depreciation" (RCNLD) whereby values are ascertained through cost factors of replacement of given facilities reduced by depreciation associated with those facilities as they exist at the time of valuation. In support of its challenge, the City relies on *South Bay Irr. Dist.* v. *California-American Water Co.* (1976) 61 Cal.App.3d 944 [133 Cal.Rptr. 166]. We believe that case is, indeed, dispositive on the issue of valuation, though not in the City's favor. In *South Bay,* water company was the defendant in an eminent domain action wherein a division of its operation was sought to be taken in its entirety by plaintiff irrigation district. The appellate court in a lengthy and well reasoned opinion made the following observations:

"The California Supreme Court, in the early case of *Spring Valley W. W. v. Drinkhouse*, 92 Cal. 528, 533 [28 P. 681], accepted the concept that the market value of property taken for public use equates 'just compensation' for the taking as the measure thereof in an eminent domain action; and is determined in view of all of the facts which would naturally affect its value in the minds of sellers and purchasers. In *Sacramento etc. R. R. Co. v. Heilbron, supra*, 156 Cal. 408, 409 [104 P. 979], the court gave definitive meaning to the measure theretofore approved and said: '[T]he rule is of universal acceptance that the measure of this damage is the market value; that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable.'

". . . . . . . . . . . . . . . .

"Market value as thus defined has been accepted and applied by the courts of California as the general rule governing the determination of just compensation in eminent domain actions [citations omitted].

". . . . . . . . . . . . . . . .

". . . Thus, within the limits set by admissible opinion testimony of qualified experts, the jury or the court, premised on its evaluation of the evidence in the case, determines the price upon which the assumed knowledgeable buyer and seller would agree [citations omitted]; in determining what factors would motivate them in reaching an agreement as to price, and in weighing the effect of their motivation, may rely upon the opinion of experts in the field and also upon its knowledge and experience shared in common with people in general [citation omitted]; and draws its own conclusion of value by a process of balancing and reconciling the varying opinions on the subject [citation omitted]. . . .

". . . . . . . . . . . . . . . .

"The provisions of Evidence Code section 814, prescribing the foundational requisites to an opinion as to the value of property, sanction an opinion based on matters of a type that reasonably may be relied upon by an expert in forming such an opinion, including but not limited to the matters listed in sections 815-821, which, in substance, describe the

appraisal trilogy consisting of three methods or approaches used by appraisers in forming an opinion as to market value [citations omitted], i.e., market data, capitalization of income and reproduction cost [citation omitted]. The market data approach includes a consideration of comparable sales [citation omitted].

". . . . . . . . . . . . . . . . .

"Reproduction-cost-new-less-depreciation, and its alternative, used by The Company's opinion witnesses, reconstruction-cost-new-less-observed-depreciation, are acceptable bases for or approaches to an opinion or determination of the market value of property taken in an eminent domain action; are not dispositive bases or approaches, nor 'market value' nor, per se, a measure of 'just compensation'; but, rather, are aids to a determination of 'market value' as the measure of 'just compensation' [citations omitted]." (*South Bay, supra,* 61 Cal.App.3d at pp. 967, 968, 969-970, 975; fn. omitted.)

 In the instant case, the Company's expert testimony was confined to the RCNLD method but that was not the only valuation testimony presented. On the contrary, the City's experts testified as to other methods and other values and there is nothing to show the jury's award was premised solely on the one method and not the others.  Under these circumstances ". . . The Company's arguments in support of many of its contentions implicitly are directed to the weight and interpretation of the evidence, which are not within the scope of appellate review. The trier of fact is the sole arbiter of such matters (*Thompson* v. *City of Long Beach,* 41 Cal.2d 235, 246 . . . ; *Dillard* v. *McKnight,* 34 Cal.2d 209, 223 . . .); is not required to accept the opinion testimony of any witness as to value (*People* v. *Ocean Shore Railroad,* 32 Cal.2d 406, 427 . . .); in the exercise of judicial discretion may accept that part of such testimony he concludes worthy of belief and reject that part which is unworthy of belief (*Bechtold* v. *Bishop & Co., Inc.,* 16 Cal.2d 285, 291-292 . . . ; *Cottle* v. *Gibbon,* 200 Cal.App.2d 1, 7 . . .); and, in determining the amount of just compensation in an eminent domain action, is not required to coincide his determination with the specific amount fixed by the valuation testimony of any expert witness (*City of Los Angeles* v. *Retlaw Enterprises, Inc.,* 16 Cal.3d 473, 491-492 . . . ; *Joint Highway Dist. No. 9* v. *Railroad Co.,* 128 Cal.App. 743, 762 . . .)." (*South Bay, supra,* 61 Cal.App.3d at pp. 965-966.)

■ Moreover, under a correct understanding of *South Bay,* the jury might have found fair market value in the amount it did even if no other evidence other than that relating to RCNLD were introduced, assuming only that that evidence was understood as relating to but not the equivalent of fair market value.

## II. Compensable Value of Certain Facilities of the Company Not Located Within Service Area.

■ The City proffers also the argument that certain facilities of the Company which were valued for purposes of the jury's award were not "within the area now being serviced by the City nor physically connected to any facilities serving subject area" and in support of its contention provides an interpretation of portions of the language of the Service Duplication Law. The facilities referred to were found by the trial court at the legal phase of the bifurcated trial to be part of those "made inoperative, reduced in value or rendered useless" to the Company. Our own reading of Public Utilities Code section 1503, *supra,* is consistent with that conclusion. The Service Duplication Law, in addition to its obvious relation to the law of eminent domain generally, is, as noted earlier, a comprehensive legislative scheme aimed at a particular type of problem involving aspects of competition between entities which otherwise by their historic and economic nature are monopolistic. This being the case, we see no reason, and are cited no authority to the contrary, to suppose the language of that Law should not be understood to mean what it says; namely, that when a political subdivision encroaches in the fashion described upon a private utility, as defined, it is answerable in damages for the taking to the extent of injury to *any* of the property employed by the utility in providing water service so made "inoperative, reduced in value or rendered useless," in spite of its physical location.

## III. Relationship of the Service Duplication Law to California Constitution, Article XI, Section 9.

In similar manner, the City contends the constitutional authority granted by article XI, section 9 of the Constitution to municipal corporations to establish and operate water works for their inhabitants should be construed so as to require "critical review" of the Service Duplication Law and that the application of that Law must be conducted in a fashion which balances the "competing interests" inherent in the City's exercise of its constitutional right as against the Company's

legislative right. The City concedes the Service Duplication Law was held constitutional in *Cucamonga County Water Dist.* v. *Southwest Water Co.* (1971) 22 Cal.App.3d 245 [99 Cal.Rptr. 557]. It offers nothing in decisional support of its ingenuous argument and we are not aware of the existence of any such support, though we confess there may be some doubt we understand fully the contention.

IV. The Action as One in Inverse Condemnation.

The Service Duplication Law describes situations where political entities may by their otherwise unobjectionable actions be held to have taken private property for public use (Pub. Util. Code, § 1503, *supra*). In its initial form it specifically provided for the taking to be compensable under section 14 of article I of the Constitution of California.[1] Effective July 1, 1976, the constitutional reference was deleted, apparently because the Law Revision Commission felt it redundant in view of the requirement of section 1504 for "just compensation." ■ In any event, it is clear the constitutional proscription is applicable to the Service Duplication Law and therefore equally clear that where, as here, the plaintiff has been obliged to take the initiative to secure compensation through inverse condemnation, it is entitled to whatever benefits are appropriate under Code of Civil Procedure section 1036 (formerly § 1246.3), which provides: "In any inverse condemnation proceeding brought for the taking of any interest in real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, or the attorney representing the public entity who effects a settlement of such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will, in the opinion of the court or such attorney, reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding." (See generally, *City of Los Angeles* v. *Monahan* (1976) 55 Cal.App.3d 846 [127 Cal.Rptr. 763].)

This result is further confirmed by the requirement in section 1504, *supra,* that compensation be determined by mutual agreement of the parties or fixed by court "pursuant to the laws of this state relating to eminent domain . . . ."

---

[1]Now substantially contained in article I, section 19.

## THE CROSS-APPEAL

V. Reasonable Litigation Expenses Under Code of Civil Procedure Section 1036.

The Company presented its memorandum of costs and disbursements following the trial in this matter in the total amount of $80,711.56. Of this, the sum of $46,351 represented attorney fees, $31,757.50 appraisal and engineering fees and $1,416.74 other expenses of attorneys and engineers. The accuracy and appropriate character of these amounts were supported by accompanying declarations and photocopy evidence of statements submitted to and paid by the Company. On January 21, 1977, the City filed its notice of motion to tax costs objecting to the application of Code of Civil Procedure section 1036 and, assuming its applicability, asserting the amounts claimed were excessive. On March 11, 1977, the trial court made its minute order reducing attorney fees to $35,000, appraisal and engineering fees to $12,949.17 and other expenses of engineers and attorneys to $500. The Company's appeal from that order was consolidated with the City's appeal herein.

We do not have the benefit of any reporter's transcript relating to this aspect of the case.[2] The declaration of Robert Flandrick, one of the attorneys for the City, asserted, inter alia, (a) that the Company had been physically represented throughout both phases of the trial by two attorneys and that in terms of participation only one had taken an active role; and (b) that the appraisers and engineers employed by the City, who, it was maintained, were equally qualified as those of the Company, had devoted less than one-half the time of their counterparts' preparation for and participation in the case. No other significant evidence on the question of fees and costs appears in the record.

---

[2]We are confronted with both procedural and substantive problems as a result of this fact. It is settled that on a clerk's transcript alone there is a conclusive presumption on appeal that findings by the trial court are supported by the evidence and may not be disturbed. (*Wagner* v. *Chambers* (1965) 232 Cal.App.2d 14 [42 Cal.Rptr. 334].) Here, no findings were made nor is there any indication in the trial court's minute order that evidence other than that before us in documentary form was presented or considered. And while it is true that a reviewing court on motion of the respondent or on its own motion may order augmentation of the record whenever it is necessary to prevent a miscarriage of justice (Cal. Rules of Court, rule 5(f)), we are not aware of any facts nor apprised of any by the City which would encourage us to expand the record here considered. (See also *Wagner* v. *Chambers, supra*, at p. 21.)

■ It is clear from its terms that Code of Civil Procedure section 1036 places upon the trial court the duty to determine and award such sum as will "in the opinion of the court" reimburse the plaintiff in inverse condemnation for his "reasonable costs, disbursements, and expenses," and that the statute contemplates a considered though discretionary judgment. Consequently, our review of the exercise of that judgment must be made within the confines of well established principles dealing with discretion and its abuse. (See generally, *Temescal Water Co. v. Dept. Public Works* (1955) 44 Cal.2d 90 [280 P.2d 1]; *Varas v. Barco Mfg. Co.* (1962) 205 Cal.App.2d 246 [22 Cal.Rptr. 737]; *Loomis v. Loomis* (1960) 181 Cal.App.2d 345 [5 Cal.Rptr. 550].)

■ Here, it was shown the Company's expert appraiser, Thomas M. Stetson, and his staff spent a total of some 1,340 hours in connection with the case and that the total billing for that activity averaged somewhat less than $24 per hour. Based on the trial court's reduction, that average figure was reduced to about $10 per hour. The City's expert, on the other hand, testified his firm's average hourly rate was about $31 per hour. Admittedly, as stated before, the city's experts were able to accomplish their function in lesser time, about 570 hours. But it is not clear to us how this fact in and of itself can diminish the value of the efforts of the Company's experts. On the evidence appearing in the record on appeal, we hold as a matter of law there was no sufficient basis for any reduction in the amounts claimed by the Company and that therefore the trial court abused its discretion in this regard. A similar conclusion, we believe, must be made with respect to attorney fees, since there is nothing before us to show how the trial court arrived at its determination. While we may with some confidence suppose the arguments contained in the City's declaration in support of its motion to tax costs were accepted by the trial court, we deem it a wholly questionable notion that the presence of two counsel for one party at a trial as complex in nature as this is alone enough to provide any reasonable basis to say one of those counsel made no contribution by his or her presence and that attorney fees should be reduced accordingly. Here, admittedly competent counsel and expert witnesses on both sides prepared and presented their respective cases in a fashion which as the record shows can only be described as professional in every regard. However, it would be unrealistic for us to overlook the greater burden assumed by the Company owing to the very nature of inverse condemnation and the ultimate results achieved on behalf of the Company. Having this in mind, there was no adequate reason shown for the reductions made by the trial court.

The judgment appealed from by appellant is affirmed. The order dated March 11, 1977 as modified March 21, 1977, which is the subject of the cross-appeal is modified by restoring Item 28 to $31,757.50, Item 32 to $1,416.74 and Items 30 and 31 to $5,675 and $40,676, respectively. As so modified said order is affirmed.

Fleming, J., and Beach, J., concurred.

The petition of the defendants and appellants for a hearing by the Supreme Court was denied June 15, 1978.